[Cite as *State v. White*, 2020-Ohio-3313.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2019-07-118 |
| | : | O P I N I O N |
| - vs - | | 6/15/2020 |
| | : | |
| GONNII WHITE, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2018-08-1418

Michael T. Gmoser, Butler County Prosecuting Attorney, John C. Heinkel, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Michele Temmel, 6 South Second Street, #305, Hamilton, Ohio 45011, for appellant

**PIPER, J.**

{¶1} Appellant, Gonnii White, appeals his conviction in the Butler County Court of Common Pleas for murder.

{¶2} Just before midnight on May 29, 2018, the Middletown Police Department received a call that shots had been fired in the Woodlawn Avenue area. When officers arrived, they found the area crowded with approximately 50 people and the victim lying in

the street. The victim, 17-year-old Joseph Davis, had been shot four times, once in the buttocks, once in the thigh, once in his back, and once in his neck. Davis was pronounced dead after he was transported to the hospital.

{¶3} During the ensuing investigation, detectives learned that Davis and several of his associates, known in the neighborhood as the Detroit Boys, had been in physical altercations with White and several of his associates, who were known in the neighborhood as the Roadrunners. At that time, White was 16 years old. Detectives soon learned that the fighting and disagreements between the groups were gang related and that White and the victim were in different gangs that had a history of conflict.

{¶4} White was taken to the police station for questioning, during which time he waived his *Miranda* rights and spoke to detectives. At first, White claimed that he was not present at the time of the shooting. The detectives told White that witnesses had reported their observations that White shot Davis in self-defense, which was not the truth, as no such witnesses had come forward. White then admitted that he shot Davis and claimed that he did so in self-defense based on his belief that Davis had a firearm and was getting ready to shoot him or the friends he was with at the time.

{¶5} White was taken into custody and ultimately charged as an adult with murder, a firearm specification, and a specification for participation in a criminal gang during the commission of the offense.

{¶6} White filed a motion to suppress, arguing that his confession was involuntarily given. The trial court held a hearing, and overruled White's motion. White also filed a motion in limine, challenging the state's proposed expert witness who would testify to gang-related matters. The trial court held a hearing and denied White's motion.

{¶7} The matter proceeded to a trial, during which White testified in his own defense, and claimed self-defense. A jury found White guilty, and the trial court sentenced

him to 15 years to life for the murder, plus two consecutive sentences of three years for each of the specifications for an aggregate sentence of 21 years to life. White now appeals his conviction, raising the following assignments of error.

{¶8} Assignment of Error No. 1:

{¶9} THE TRIAL COURT ERRED WHEN IT OVERRULED DEFENDANTS [SIC] MOTION TO SUPPRESS THE STATEMENTS HE MADE TO DETECTIVES AT THE MIDDLETOWN POLICE DEPARTMENT.

{¶10} White argues in his first assignment of error that the trial court erred by denying his motion to suppress.

{¶11} Appellate review of a trial court's denial of a motion to suppress presents a mixed question of law and fact. *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12. When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Oatis*, 12th Dist. Butler No. CA2005-03-074, 2005-Ohio-6038, ¶ 10. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *Cochran* at ¶ 12.

{¶12} "When a suspect is questioned in a custodial setting, the Fifth Amendment requires that he receive *Miranda* warnings to protect against compelled self-incrimination." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, ¶ 34. "A suspect may then knowingly and intelligently waive these rights and agree to make a statement." *Id.* If a defendant later challenges a confession as involuntarily given, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence. *State v. Vunda*,

12th Dist. Butler Nos. CA2012-07-130 and CA2013-07-113, 2014-Ohio-3449, ¶ 15.

{¶13} The test for voluntariness pursuant to a Fifth Amendment analysis is whether the accused's statement was the product of police overreaching. *State v. Hernandez-Martinez*, 12th Dist. Butler No. CA2011-04-068, 2012-Ohio-3754, ¶ 16. A suspect makes a voluntary confession absent evidence "that his will was overborne and his capacity for self-determination critically impaired because of coercive police conduct." *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 857 (1987).

{¶14} In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. *Hernadez-Martinez* at ¶ 16.

{¶15} When the suspect is a juvenile, in addition to age, the totality of the circumstances includes the juvenile's experience, education, background, and intelligence, as well as his or her capacity to understand the warnings given, the nature of Fifth Amendment rights, and the consequences of waiving those rights. *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, ¶ 24.

{¶16} After reviewing the record, we find that the trial court properly overruled White's motion to suppress, as he voluntarily waived his Fifth Amendment rights before giving his confession. During the motion to suppress hearing, the detective who questioned White testified that the interview occurred at the police station in an interview room. The room measured six foot by eight foot and contained a table and three chairs. During the interview, there were two detectives in the room with White. One of the detectives read White his *Miranda* rights and presented White with a card that contained in writing the rights White was waiving if he agreed to speak with the detectives. White signed the card,

indicating that he understood and was willing to give up his Fifth Amendment rights against self-incrimination.

{¶17} The detective further testified that during the interview, White did not appear to be under the influence of any substance and that nothing was impairing White's ability to have a conversation with the detectives. White was not handcuffed or restrained during his interview, and the detectives did not threaten White in any manner. The interview lasted approximately one hour, during which neither detective raised their voices nor demanded anything of White. White was provided a beverage at his request and was not deprived of anything during the interview.

{¶18} The state played a video of the interview, and the trial court was able to observe White's actions and demeanor during the interview, including White reading the *Miranda* card and signing it. The trial court noted that White followed along as the detective read White his rights, and that White agreed and signed the card "under no protest." The trial court also noted that White appeared mature for his age, which was 16 at the time of the shooting. Moreover, White handled himself well, did not appear to be nervous or distraught, and showed no fear or apprehension about being in the police station or being interviewed by the detectives.

{¶19} Despite there being no indicia of police overreaching, White argues that his will was overborne when detectives lied to him and told him that they had witnesses who described the shooting as self-defense. White claims that this lie rendered his statement involuntary because the lie made him believe that confessing was safe because his actions were justified that night and would result in no legal consequences.

{¶20} The detective testified that he told White there were witnesses who told police the shooting was in self-defense, which was untrue because there were no such witnesses. The detective testified that he used this tactic because White had been untruthful in his

answers regarding his whereabouts on the night of the shooting and had lied about having an alibi when the shooting occurred. The law is well-settled that police may lie to a suspect during an interview without such deceit per se rendering a confession involuntarily given. *State v. Liso*, 12th Dist. Brown No. CA2012-08-017, 2013-Ohio-4759. *See also In re N.J.M.*, 12th Dist. Warren No. CA2010-03-026, 2010-Ohio-5526, ¶ 26 (a defendant's will is not overborne simply because he or she is led to believe that the government's knowledge of guilt is greater than it actually is).

{¶21} The trial court found, and we agree, that the detective did not "step over the line" when discussing the issue of self-defense and that the lie did not cause White's will to be overborne where he exhibited every indication of maturity, the ability to "handle himself," and was in "control of his faculties."[1] It appears White simply recalculated that a claim of self-defense with witnesses was better than a claim he was not at the scene with no witnesses to support such a claim or otherwise provide an alibi. The video demonstrated that White was aware of what was occurring and nothing about the detective's statement critically impaired White's capacity for self-determination.

{¶22} After reviewing the record and considering all of White's arguments, we find that White knowingly and intelligently waived his rights and that his confession was voluntarily made. As such, the trial court properly overruled White's motion to suppress and White's first assignment of error is overruled.

{¶23} Assignment of Error No. 2:

{¶24} THE TRIAL COURT ERRED WHEN IT OVERRULED DEFENDANT'S MOTION IN LIMINE.

---

1. This court has viewed the video recording of White's interview and confession and agrees with the trial court regarding its perceptions of White's maturity and demeanor.

{¶25} White argues in his second assignment of error that the trial court erred by denying his motion in limine to exclude testimony on gangs from an expert witness.[2]

{¶26} A trial court's decision to admit or exclude evidence will not be reversed by a reviewing court absent an abuse of discretion. *State v. McLaughlin*, 12th Dist. Clinton No. CA2019-02-002, 2020-Ohio-969, ¶ 42. An abuse of discretion implies more than an error of law or judgment; it suggests that the trial court acted in an unreasonable, arbitrary, or unconscionable manner. *State v. Babyak*, 12th Dist. Madison No. CA2019-08-025, 2020-Ohio-325, ¶ 11.

{¶27} Evid.R. 702 provides that a witness may testify as an expert if (1) the witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons, (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony, and (3) the witness' testimony is based on reliable scientific, technical, or other specialized information.[3]

{¶28} Thus, Evid.R. 702 permits the use of testimony of an expert "if the testimony will aid the trier of fact in understanding the evidence or in determining a fact in issue." *State*

---

2. The state argues in its brief that White failed to renew his objection to the trial court's decision denying his motion in limine. However, White renewed his objection on the third morning of the trial, before the jury was called into the room for the day. Defense counsel also raised several objections throughout the detective's testimony. While it is true that White did not raise an objection for each question asked of the witness, we will review the trial court's decision for an abuse of discretion, rather than for plain error.

3. The record is not entirely clear whether the detective testified as an expert or lay witness. The trial court stated at the end of the motion in limine hearing "the Court, at this point, finds that based upon its gatekeeping duties here today that the testimony of [the detective] is warranted in this case and will permit her to testify as an expert witness, and that will be the order of the court." During the trial, the state inquired of the detective's qualifications and education, but did not ask the trial court to accept her as an expert. Even so, defense counsel questioned on cross-examination the detective's training and credentials, as if the witness had been deemed an expert, and the jury instructions includes an expert witness charge. When the issue was addressed on the third day of trial, the trial court and state expressed a lack of certainty as to whether testimony had to be given on gang-related issues by an expert. The trial court noted, "whether it's expert testimony or lay testimony is a question the law is kind of nebulous about. But at any rate, the Court will permit some of it." Because of the lack of clarity in the record, and given the murder conviction at issue, we will review the matter using the more strenuous requirements of Evid.R. 702, but note that the detective's testimony is also admissible under the lay witness standard set forth in Evid.R. 701.

*v. Boston*, 46 Ohio St.3d 108, 118 (1989). The testimony offered must provide information to the factfinder which is sufficiently beyond common experience. *State v. Cooperstein*, 12th Dist. Warren No. CA2018-09-117, 2019-Ohio-4724, ¶ 51.

{¶29} A witness who possesses "specialized knowledge about gang symbols, cultures, and traditions beyond that of the trier of fact," may be qualified as an expert on gang-related matters. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 116. "Unlike scientific testimony, expert testimony about gangs depends heavily on the expert's knowledge and experience rather than on the expert's methodology and theory." *Id.* at ¶ 119.

{¶30} The state presented testimony from a detective who investigates gang-related criminal activity for the Middletown police department. We first find that the testimony relates to matters beyond the knowledge or experience possessed by lay persons because the testimony was specific to gang history and gang-related identification. Specifically, the detective testified about the history of the two most prominent gangs in Middletown, when they came into existence, indicia of gang membership, codes, symbols, as well as gang ideology – none of which the jury was likely to know or have experience with absent the detective's testimony.

{¶31} Second, the state presented evidence that the detective was specially educated on gangs and gang identification. The detective completed various course work with the National Gang Crime Research Center, including The Basic Gang Specialist Program, Advanced Gang Identification, and Gang Homicide Investigation Skills. The detective also spent time being mentored by experts in the field and had been working on gang-related investigations for several years.

{¶32} Lastly, the detective testified about matters in which she had reliable specialized information. The detective testified about her surveillance of gang activity

specific to Middletown, including identifying members of the various gangs known to exist in the area. The detective also knew the history of gangs in the area, and how they came to be. Specifically, the Crips began to form in 2005, and based its membership in the Middletown area near Douglas Park. The Crips is the largest gang in the United States, and the Crips sect in Middletown is known as the Roadrunners. The detective testified that the Crips' enemy gang is the Bloods and that there have been numerous shootings and violence between the groups. Since 2005, the detective has run surveillance on the gangs to identify members and investigate when gang members commit crimes. The detective has also tracked gang symbols, hand signals, and social media accounts that portray gang affiliation.

{¶33} Thus, the detective was qualified under Evid.R. 702 to testify as an expert in gang activity and her testimony aided the jury in understanding the evidence specific to why White killed Davis and why he did so as part of gang-related crime. The subject of the detective's testimony was sufficiently beyond the jury's common experience, and necessary to understand the state's theory of the case and the charges White was facing.

{¶34} After reviewing the record, the trial court did not abuse its discretion by admitting the challenged testimony because the witness was qualified to testify as an expert on gang-related matters.

{¶35} Assignment of Error No. 3:

{¶36} THE JURY'S VERDICT WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶37} White argues in his third assignment of error that his conviction is against the manifest weight of the evidence.

{¶38} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather

than the other."  *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14.  To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶39}  Questions regarding witness credibility and weight of the evidence "are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence."  *State v. Walker*, 12th Dist. Butler App. No. CA2006-04-085, 2007-Ohio-911, ¶ 26.  As a result, "the question upon review is whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed."  *State v. Erdmann*, 12th Dist. Clermont Nos. CA2018-06-043 and CA2018-06-044, 2019-Ohio-261, ¶ 22.  Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal.  *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43.

{¶40}  White was convicted of murder in violation of R.C. 2903.02(B), which prohibits causing another's death "as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."  The underlying felony for which White was convicted was felonious assault.  R.C. 2903.11(A)(1) and (A)(2) prohibits one from causing serious physical harm to another or to another's unborn, or causing physical harm by means of a deadly weapon or dangerous ordinance.

{¶41} While White did not deny shooting the victim, he claimed he acted in self-defense. "Traditionally, self-defense has been an affirmative defense which an accused must prove by a preponderance of the evidence." *State v. Debord*, 12th Dist. Clinton No. CA2019-03-003, 2020-Ohio-57, ¶ 13. However, effective March 28, 2019, the General Assembly modified Ohio's self-defense statute, R.C. 2901.05, to place the burden on the state to prove beyond a reasonable doubt that the accused did not act in self-defense. *State v. Byrd*, 12th Dist. Warren No. CA2019-07-073, 2020-Ohio-3073, ¶ 22. R.C. 2901.05(B)(1) provides,

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶42} An accused is justified in the use of force against another if (1) the accused was not at fault in creating the situation giving rise to the affray, (2) the accused had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force, and (3) the accused did not violate any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. Due to the recent amendment to R.C. 2901.05(B)(1), the state had to disprove one of the elements of self-defense beyond a reasonable doubt. *Byrd* at ¶ 23.

{¶43} After reviewing the record, we find that White's conviction was not against the manifest weight of the evidence. During trial, the state presented testimony from an officer who responded to the call of shots fired. On his way to the scene, the officer encountered

White and an associate running away from the scene. The officer spoke with White and noticed that he seemed nervous and was sweating. White told the officer that he and his associate were running because they heard shots being fired. However, White never told the officer that he was in fear for his life, or that he had shot Davis in self-defense.

{¶44} The state also called the coroner who performed an autopsy of Davis' body. The coroner testified that Davis was shot four times, once in the buttocks, once in the back, once in the thigh, and once in the neck. The coroner confirmed that the gunshot wounds were the cause of Davis' death, and that Davis had been shot from an "intermediate" distance away, rather than anything up close as if a struggle had ensued.

{¶45} The state next presented testimony from a witness who was with White on the night of the shooting. The witness testified that he and several friends were playing basketball on the night of the shooting, and that they eventually left the court on foot. The group encountered Davis, who was riding his bicycle down the street. The witness testified that when he called to Davis, Davis turned and slipped off his bicycle. White then ran up to Davis, who was on the ground at the time, and began shooting him.

{¶46} The witness testified that White shot Davis four times and that Davis was on the ground the entire time, with nothing in his hands. The witness further testified that Davis made no threats before he was shot.

{¶47} The state also presented evidence from the detective educated in gang matters. The detective testified that photographs were recovered from White's phone that were gang-related in which White is wearing Crip colors and making a hand signal of "Blood Killer," which indicated an intent to kill a member of the rival Blood gang; the gang to which Davis belonged. White also had a text message of the "Crip Prayer" sent to him by the Middletown "street leader." White also self-identified as a Roadrunner on his Instagram account profile picture, and had numerous Crip-related identifiers throughout his social

media accounts.

{¶48} The detective also noted that people associated with White's social media accounts, such as White's Instagram followers and others who made comments on his Facebook posts, were also associated with gangs. The photographs and posts on White's social media pages glorified firearms, money, and drugs with some including reference to drive-by shootings and people running from firearms. The detective also testified that White rarely used the letter "B" in his posts because the letter is a symbol of the rival gang, Bloods, and that White would instead use the numeral six (6) to replicate the look of a letter "b." On another post, White wrote, "Let it rain, let it flood, let a Crip kill a Blood. Let it drip, let it drop, let a Blood flip flop."

{¶49} The jury also viewed a taped recording of White's police interview during which he ultimately admitted to shooting Davis. However, the video also showed that White lied to the detectives during the first part of the interview. Specifically, White told the detectives that he was video chatting with this girlfriend at home, and later fell asleep. He claimed to have later gone to his girlfriend's home and was returning from there when he heard gunfire. Moreover, White did not claim self-defense until the detective mentioned eyewitnesses reporting to police that White acted in self-defense.

{¶50} White testified that he acted in self-defense because he believed that Davis had a firearm on the night of the incident and that Davis was getting ready to draw the weapon when the group encountered him. White testified that he could not "run from a bully," and that his friends could have been in danger if he did not shoot Davis. When asked why he did not stay at the scene and wait for police, White answered that the police would not have believed him.

{¶51} After reviewing the record, we find that the jury did not lose its way or create a manifest miscarriage of justice in finding White guilty. The jury was in the best position to

judge the credibility of the witnesses, including the witness who testified that Davis was on the ground unarmed when White ran over and shot him four times. The witness' testimony allowed the prosecution to prove beyond a reasonable doubt that White was at fault for creating the situation because he ran *toward* Davis while Davis was on the ground having fallen off his bicycle. White, even if he had feared for his life because of past trouble with Davis and rival gangs, had the opportunity to run away while Davis was on the ground. Instead, the record indicates that White shot Davis at an intermediate range and then continued to shoot him three more times as he lay on the ground.

{¶52} Moreover, the jury was in the best position to judge White's credibility when he testified that he acted in self-defense and that he feared for his life on the night of the incident. We will not disturb the jury's determination that White's testimony lacked credibility on this or any issue. As such, we find that White's conviction and the accompanying specifications were not against the manifest weight of the evidence. Therefore, White's third assignment of error is overruled.

{¶53} Judgment affirmed.

S. POWELL, P.J., and RINGLAND, J., concur.