[Cite as *State v. Hawkins*, 2021-Ohio-3072.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2020-07-039 |
| | : | O P I N I O N |
| - vs - | | 9/7/2021 |
| | : | |
| LADARIUS V. HAWKINS, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 19CR35448

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Hicks Law Office, and Bryan Scott Hicks, for appellant.

**PIPER, P.J.**

{¶ 1} Appellant, Ladarius Hawkins, appeals his convictions in the Warren County Court of Common Pleas for aggravated vehicular homicide, aggravated vehicular assault, and operating a vehicle under the influence ("OVI").

{¶ 2} At 8:15 a.m. on a Sunday morning in 2019, Hawkins disregarded his red light and proceeded through an intersection where he crashed into a car driven by Roger

Lohman. Roger's wife, Norma Jean, was a passenger in the car, and the two were returning home that morning after attending mass. Roger was killed as a result of the crash. His brainstem was lacerated, as were his heart, thoracic aorta, spleen, and diaphragm. The vertebrae in Roger's neck were also fractured. Norma Jean survived the crash, but sustained significant injuries, including traumatic brain injury. She endured extensive recovery in the hospital and subsequent rehabilitation and currently functions at the equivalent of a three-year-old child.

{¶ 3} Data retrieved from Hawkins' vehicle indicated that just prior to the crash, Hawkins was driving at 65 m.p.h. and was pressing on the gas pedal three seconds prior to the crash. Hawkins did not deploy the brakes until one second before impact. Hawkins was uninjured in the crash and refused medical treatment at the scene. Later medical attention confirmed that Hawkins did not sustain injury from the crash.

{¶ 4} After speaking with Hawkins, police on the scene observed indicia of his intoxication and marijuana usage. An officer detected the odor of marijuana and of an alcoholic beverage emanating from Hawkins' vehicle. Hawkins stumbled when he exited his vehicle, appeared groggy, and exhibited slow reactions. An Ohio State Highway Patrol Trooper questioned Hawkins regarding the crash and observed that Hawkins' speech was slurred and sluggish, his eyes were bloodshot and watery, and that Hawkins was unsteady on his feet. The trooper also smelled the odor of an alcoholic beverage as well as marijuana emanating from Hawkins' vehicle and person and further observed that Hawkins' clothing was soaked with urine.

{¶ 5} Officers located marijuana in the console of Hawkins' vehicle, and Hawkins admitted that he had ingested alcohol at a bar sometime prior to the crash. The trooper administered field sobriety tests to Hawkins who exhibited multiple clues of intoxication at the time of testing. The trooper arrested Hawkins for OVI, as well as for driving under a

suspended driver's license. The trooper advised Hawkins of his *Miranda* rights and then placed him in a police cruiser. Hawkins became combative, cursed the trooper, and kicked the doors and window of the cruiser.

{¶ 6} The trooper transported Hawkins to the emergency room where Hawkins refused to submit to a blood and urine test. The trooper then secured a search warrant, and nurses at the hospital collected the samples. Testing confirmed that Hawkins' system contained marijuana and that his blood alcohol content ("BAC") was 0.151 at the time of testing. The Chief of Toxicology with the Hamilton County Coroner's Office analyzed the results and estimated that Hawkins' BAC at the time of the crash was between 0.176 and 0.245.

{¶ 7} Hawkins was indicted on two counts of aggravated vehicular homicide, aggravated vehicular assault, vehicular assault, and three counts of OVI. During the pendency of the proceedings, the state dismissed two counts of OVI. The matter proceeded to a jury trial, and the jury found Hawkins guilty on all counts and also found that Hawkins had driven with a suspended driver's license at the time of the crash. The trial court merged allied offenses and subsequently sentenced Hawkins to an aggregate sentence of 15 to 20 years in prison, which contained consecutive sentences. Hawkins now appeals his convictions and sentence, raising the following assignments of error.

{¶ 8} Assignment of Error No. 1:

{¶ 9} THE EXPERT TESTIMONY AS TO BACK EXTRAPOLATION FOR BAC AT THE TIME OF THE ACCIDENT MISLED THE JURY AGAINST THE MANIFEST WEIGHT.

{¶ 10} Hawkins essentially challenges his convictions as being against the manifest weight of the evidence because such were predicated upon improper expert testimony.

{¶ 11} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather

than the other." *State v. Erdmann*, 12th Dist. Clermont Nos. CA2018-06-043 and CA2018-06-044, 2019-Ohio-261, ¶ 22. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶ 12} Questions regarding witness credibility and weight of the evidence "are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker*, 12th Dist. Butler App. No. CA2006-04-085, 2007-Ohio-911, ¶ 26. As a result, "the question upon review is whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." *Erdmann* at ¶ 23. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43.

{¶ 13} Hawkins essentially argues that his convictions were against the manifest weight of the evidence because an expert testified regarding the extrapolation of Hawkins' BAC at the time of the accident. Hawkins asserts that he was not under the influence at the time of the accident, and instead, his behavior that morning was the result of the crash.

{¶ 14} The crash occurred at approximately 8:15 a.m. and Hawkins' blood and urine samples were taken between 11:40 – 11:45 a.m. The stated presented testimony from the expert regarding alcohol absorption and elimination rates. The expert opined that at the

time of the crash, Hawkins' BAC was between .0176 and .0245. At that level, Hawkins' cognitive and psychomotor behaviors would have been impaired. On cross-examination, the expert admitted that his calculations had not included absorption factors and that he had assumed that absorption had stopped despite not having direct evidence of when Hawkins had stopped consuming alcohol.

{¶ 15} While the expert made certain assumptions as part of his analysis, the record indicates that Hawkins' BAC was 0.151 at the time the samples were taken, some three hours after the accident occurred. Hawkins cross-examined the expert extensively on his methods, as well as assumptions the expert included in his extrapolations. Thus, Hawkins was able to challenge the expert's methodology and allow the jury to understand the confines of the extrapolation method given certain unknowns.[1]

{¶ 16} Moreover, the jury was specifically instructed that the BAC number itself did not establish whether Hawkins was intoxicated at the time of the crash. "The results and testimony of blood and/or urine tests may only be considered by you as evidence indicating whether the Defendant had or had not consumed alcohol and/or ingested some drugs. You may not, on the basis of the test alone, conclude or infer that the Defendant was or was not under the influence." Thus, the jury was aware of how it was to use the BAC evidence, and its deliberation included all evidence presented by the state supporting Hawkins' intoxication at the time of the crash.

{¶ 17} The jury heard testimony from law enforcement personnel who responded to

---

1. Throughout his brief, Hawkins refers to a trial court's duty to act as gatekeeper of expert testimony. However, he does not assign as error anything specific to the lack of a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993). Even so, there is no indication in the record that had a *Daubert* hearing been held, the expert testimony would have been curtailed or excluded in any manner. Furthermore, the record indicates that Hawkins questioned the expert in front of the jury as to his qualifications before the expert gave his testimony. During this voir dire, Hawkins inquired into the expert's education and was permitted to explore the expert's qualifications before the expert continued his testimony. After Hawkins' questioning, the trial court specifically accepted the expert as an expert witness. Thus, the trial court clearly executed its gatekeeping duties.

the scene that Hawkins showed obvious signs of impairment at the time of the accident, including slurred speech, bloodshot and watery eyes, that Hawkins had urinated upon himself, as well as an odor of marijuana and an alcoholic beverage emanating from Hawkins' vehicle and his person. It is undisputed from the record that officers located marijuana in Hawkins' vehicle and that Hawkins admitted to consuming alcohol.

{¶ 18} The trooper who administered the field sobriety tests testified that Hawkins was unable to follow instructions, was not able to maintain his balance, was unable to count in a sequential manner, could not say the alphabet properly, was "unsteady" on his feet, and was unable to stand on one foot or to walk with one foot in front of the other.

{¶ 19} The trooper testified that prior to administering the field sobriety tests, he questioned Hawkins to determine whether Hawkins had any medical or non-medical reasons why he could not perform the tests or impediments that may have impacted the accuracy of the tests. Hawkins answered "no" to the questions posed by the trooper regarding medical issues, such as whether Hawkins had any issues with his head, any eye problems, problems with his ears, if he was diabetic or epileptic, or if there was anything that would potentially impact the testing.

{¶ 20} Moreover, the trooper specifically observed Hawkins' eyes before administering the horizontal gaze nystagmus test to ensure that Hawkins' pupils were of equal size and that his eyes did not have nystagmus related to the crash. The jury was in the best position to judge the credibility of the testimony presented, and we will not disturb the jury's determination in this instance.

{¶ 21} Furthermore, the state presented evidence that Hawkins received medical attention despite his statement that he did not need such. Once he was arrested and taken to the hospital for testing, Hawkins underwent a CAT scan and other medical testing. A nurse testified that because Hawkins was involved in a crash, "we did our protocol for a

trauma workup. So he got an IV placed with blood work. And he went over to CAT scan to rule out any head injury." This testing revealed that Hawkins had not sustained injuries from the crash, and the nurse testified that Hawkins received no medical treatment. The observations from law enforcement, as well as the medical testing, was further supported by the fact that Hawkins was driving irresponsibly *before* the crash occurred.

{¶ 22} As noted above, Hawkins ran a red light, was traveling at a high rate of speed, and did not brake until one second before impact. This erratic driving clearly demonstrates the cognitive and psychomotor impairment that would result from driving while under the influence, including poor judgment, failure to process information, an inability to judge time and distance, as well as an inability to timely respond to the circumstances before the crash occurred.

{¶ 23} While Hawkins argued that his behavior was attributed to the crash rather than any intoxication, the state presented evidence that such was not the case. The jury was in the best position to judge the credibility of the witnesses and the weight of the evidence presented by both parties regarding the cause of Hawkins' behavior after the crash. Based on its verdict, the jury concluded that the state's evidence was more compelling, and we will not disturb that determination on appeal.

{¶ 24} After reviewing the record, we find that this case does not present the extraordinary circumstances where the evidence presented at trial weighs heavily in favor of acquittal so that the conviction must be overturned. Instead, Hawkins' convictions were not against the manifest weight of the evidence, and his first assignment of error is overruled.

{¶ 25} We will address Hawkins' next two assignments of error together, as they are interrelated.

{¶ 26} Assignment of Error No. 2:

{¶ 27} THE TRIAL COURT IMPROPERLY PERMITTED EXPERT TESTIMONY.

{¶ 28} Assignment of Error No. 3:

{¶ 29} TRIAL COUNSEL WAS INEFFECTIVE.

{¶ 30} In his second and third assignments of error, Hawkins asserts that the trial court improperly permitted expert testimony and that his trial counsel was ineffective for failing to object to the admission of such testimony.

{¶ 31} Normally, the trial court's decision to admit or exclude evidence will not be reversed by a reviewing court absent an abuse of discretion. *State v. McLaughlin*, 12th Dist. Clinton No. CA2019-02-002, 2020-Ohio-969, ¶ 42. An abuse of discretion implies more than an error of law or judgment; it suggests that the trial court acted in an unreasonable, arbitrary, or unconscionable manner. *State v. Babyak*, 12th Dist. Madison No. CA2019-08-025, 2020-Ohio-325, ¶ 11. However, the record indicates that Hawkins did not raise an objection to the expert's testimony regarding the extrapolated BAC range. Thus, he has waived all but plain error on appeal.

{¶ 32} To constitute plain error, the error must be obvious. *State v. Yanez*, 12th Dist. Butler No. CA2016-10-190, 2017-Ohio-7209, ¶ 23. Plain error is justiciable when the outcome would have been different, but for the error. *State v. Liming*, 12th Dist. Clermont Nos. CA2018-05-028 and CA2018-05-029, 2019-Ohio-82, ¶ 35. Review of plain error is made with utmost caution and only to prevent a manifest miscarriage of justice. *State v. McNeil*, 12th Dist. Warren No. CA2018-09-115, 2019-Ohio-1200, ¶ 11.

{¶ 33} Evid.R. 702 provides that a witness may testify as an expert if (1) the witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons, (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony, and (3) the witness' testimony is based on reliable

scientific, technical, or other specialized information.

{¶ 34} Thus, Evid.R. 702 permits the use of testimony of an expert "if the testimony will aid the trier of fact in understanding the evidence or in determining a fact in issue." *State v. Boston*, 46 Ohio St.3d 108, 118 (1989); *State v. White*, 12th Dist. Butler No. CA2019-07-118, 2020-Ohio-3313, ¶ 26-28. The testimony offered must provide information to the factfinder which is sufficiently beyond common experience. *State v. Cooperstein*, 12th Dist. Warren No. CA2018-09-117, 2019-Ohio-4724, ¶ 51.

{¶ 35} A trial court's role in determining whether an expert's testimony is admissible under Evid.R. 702(C) focuses on whether the opinion is based upon scientifically valid principles, not on whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial. *State v. Barrett*, 12th Dist. Butler No. CA2003-10-261, 2004-Ohio-5530, ¶ 24.

{¶ 36} To prevail on an ineffective assistance of counsel claim, an appellant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In order to prevail on a claim that counsel was ineffective, a criminal defendant must show (1) that his or her counsel's performance was deficient and (2) that that performance prejudiced him or her. *State v. Simpson*, Slip Opinion No. 2020-Ohio-6719, ¶ 18; *State v. Ford*, 12th Dist. Madison No. CA2019-10-027, 2021-Ohio-782, ¶ 13. Thus, Hawkins must (1) show that his trial counsel's performance fell below an objective standard of reasonableness as determined by "prevailing professional norms" and (2) demonstrate a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Graham*, Slip Opinion No. 2020-Ohio-6700 at ¶ 46. "The failure to make an adequate showing on either prong is fatal to an ineffective assistance of counsel claim." *State v. Kaufhold*, 12th Dist. Butler No. CA2019-09-148, 2020-Ohio-3835, ¶ 54.

{¶ 37} Hawkins asserts that the trial court should not have allowed the expert to testify regarding his BAC at the time of the accident and that his trial counsel was ineffective for not objecting to such testimony at the time it was given. Hawkins does not contest the expert's qualifications on appeal. Instead, Hawkins argues that because the expert did not know when Hawkins stopped drinking, the expert's testimony was unreliable and speculative, and thus must have been deemed inadmissible by the trial court.

{¶ 38} The expert, who had over 40 years of experience in forensic toxicology and had been recognized as an expert in court over 150 times, serves as Chief of Toxicology for the Hamilton County Coroner's Office. The expert testified that he used retrograde extrapolation, which is a scientific method of estimating a person's BAC at a specific time by using that person's known BAC from a later time. During the expert's testimony, he concluded to a reasonable degree of scientific certainty that Hawkins had a BAC between 0.176 to .0245 at the time of the crash. The expert also discussed the psychomotor and cognitive impairment that would accompany a BAC in the estimated range.

{¶ 39} We find that the trial court did not commit plain error or abuse its discretion by admitting the expert's retrograde extrapolation testimony. The expert explained that he took into consideration Hawkins' known BAC at the time his sample was taken at the hospital. Based upon the knowledge of the confirmed BAC at that time, the expert used the generally accepted rate of disappearance of alcohol from the bloodstream and extrapolated backward in time to determine what Hawkins' BAC would have been at the time of the crash. Based on this scientific method, the expert was able to estimate a BAC range between 0.176 to .0245. The expert also testified that Hawkins' behaviors on the scene of the crash, as described by the responding officers, correlated to those expected of someone with a BAC in the range he extrapolated from the known data.

{¶ 40} According to the expert's testimony, a person with a BAC in the range he

extrapolated would not be "thinking as clearly and logically as if they were sober. Their judgment is adversely affected. Their control of the vehicle is compromised. They're - - they're not processing the information around them" and such driver would "have slower reaction time." The expert also testified that the person would also have "some degree of drowsiness, coordination problems, maybe difficulty walking. * * * Slurred speech at this point is certainly a definite possibility." These attributes match behaviors Hawkins exhibited immediately following the crash as observed by responders. Specifically, a responding officer who made contact with Hawkins testified that Hawkins was "stumbling. He appeared groggy, slow reaction." The trooper also testified that Hawkins' speech was "slurred and sluggish." The trooper also observed that Hawkins was "unsteady on his feet."

{¶ 41} It is undisputed that the expert did not know exactly when Hawkins stopped consuming alcohol before the crash occurred. The expert testified to the three assumptions he makes as part of his extrapolation process: (1) the person has absorbed all the alcohol at a certain point; (2) the person is going to eliminate the alcohol at a certain rate; and (3) the person had no alcohol between the time of the crash and the time a blood sample was collected. While Hawkins asserts that such assumptions made the estimation unreliable, the record demonstrates otherwise.

{¶ 42} The record is undisputed that none of the responding law enforcement or medical personnel observed Hawkins consuming alcohol once they arrived on the scene. Nor did Hawkins consume alcohol at the hospital. Instead, Hawkins told officers that he consumed alcohol at a bar *before* the crash occurred. The expert also testified that the elimination rate he uses in his calculations applies to over 90 percent of the population, with only a possibility of a slight variance based upon a person's physiology. Even then, the rate would only be "a little faster, a little slower." Thus, the expert's extrapolation included reliable data corroborated by uncontroverted evidence. *See State v. Waldock*, 3d Dist.

Seneca No. 13-14-22, 2015-Ohio-1079, ¶ 66 (expert testimony was properly admitted despite the expert not knowing when the defendant last consumed alcohol where the expert's extrapolation of the defendant's BAC was based on facts supported in the record, such as the defendant's statement to police establishing when he last consumed alcohol the evening of a fatal crash); *State v. Guyton*, 11th Dist. Ashtabula No. 2016-A-0023, 2016-Ohio-8110, ¶ 14 (expert testimony properly accepted by trial court regarding retrograde extrapolation even though the expert assumed a timeframe when the defendant stopped consuming alcohol).

{¶ 43} After reviewing the expert's testimony, we cannot say that his retrograde extrapolation analysis was conducted in a way that would yield inaccurate results. *See Barrett*, 2004-Ohio-5530 (an expert's retrograde extrapolation testimony was properly admitted even though the expert did not know when appellant stopped drinking or exactly when the accident occurred) and *State v. Roberts*, 12th Dist. Butler No. CA97-10-186, 1998 Ohio App. LEXIS 2947 (June 29, 1998) (an expert's retrograde extrapolation testimony was found to be properly admitted at trial even though the expert assumed the accident took place at a certain time and assumed the defendant did not consume alcohol after the accident).

{¶ 44} Hawkins' objections to the speculative nature of the expert's testimony go to the weight, and not the admissibility, of the evidence. *Barrett*. The jury was fully informed of the information available to the expert, as well as what assumptions he made in order to perform the extrapolation. The jury could then afford whatever weight it deemed proper to the expert's testimony, and again, was directly instructed that evidence of Hawkins' BAC was not per se indicative of his intoxication at the time of the crash. Thus, we cannot say that the trial court's ruling constituted any error, plain or otherwise.

{¶ 45} For these same reasons, Hawkins was not denied effective assistance of

counsel. Even if Hawkins' counsel had objected to the admission of the expert's testimony regarding the extrapolated BAC, the trial court would not have abused its discretion in permitting the evidence. Given the abundance of other evidence of Hawkins' intoxication and drug usage, there is no indication in the record that the results of the trial would have been different had trial counsel objected to the BAC testimony – even if such objection would have been sustained. As such, Hawkins' second and third assignments of error are overruled.

{¶ 46} Assignment of Error No. 4:

{¶ 47} THE IMPOSITION OF CONSECUTIVE SENTENCES WAS INVALID.

{¶ 48} Hawkins argues in his final assignment of error that the trial court erred in sentencing him to consecutive sentences.

{¶ 49} An appellate court reviews an imposed sentence according to R.C. 2953.08(G)(2), which governs all felony sentences. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. R.C. 2953.08(G)(2) provides that an appellate court can modify or vacate a sentence only if the appellate court finds by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law.

{¶ 50} A sentence is not clearly and convincingly contrary to law where the trial court "considers the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, properly imposes postrelease control, and sentences the defendant within the permissible statutory range." *State v. Ahlers*, 12th Dist. Butler No. CA2015-06-100, 2016-Ohio-2890, ¶ 8.

{¶ 51} A consecutive sentence is contrary to law where the trial court fails to make the consecutive sentencing findings required by R.C. 2929.14(C)(4). *State v. Marshall*, 12th Dist. Warren No. CA2013-05-042, 2013-Ohio-5092, ¶ 8. Pursuant to R.C. 2929.14(C)(4),

a trial court must engage in a three-step analysis and make certain findings before imposing consecutive sentences. *State v. Smith*, 12th Dist. Clermont No. CA2014-07-054, 2015-Ohio-1093, ¶ 7. Specifically, the trial court must find that (1) the consecutive sentence is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) one of the following applies:

> The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).

{¶ 52} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry." *State v. Bonnell*, 140 Ohio St. 3d 209, 2014-Ohio-3177, ¶ 37. While the trial court is not required to give reasons explaining these findings, it must be clear from the record that the court engaged in the required sentencing analysis and made the requisite findings. *State v. Jones*, 12th Dist. Butler No. CA2019-05-087, 2020-Ohio-149, ¶ 10-13.

{¶ 53} After reviewing the record, and the states concedes as such, the trial court failed to make the required statutory findings at the sentencing hearing before sentencing

Hawkins to consecutive sentences. We note that the trial court's sentencing entry contains the requisite findings, but Ohio law is clear that the findings must be made at the sentencing hearing as well as in the sentencing entry. *Bonnell*. Thus, we sustain Hawkins' assignment of error and remand the matter for the sole purpose of resentencing Hawkins so that the trial court can address its findings at a sentencing hearing.

{¶ 54} Judgment affirmed in part, reversed in part, and the matter is remanded for the sole purpose of resentencing.

S. POWELL and BYRNE, JJ., concur.